# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | |
|---|---|
| AIDS HEALTHCARE FOUNDATION, | |
| Plaintiff, | Case No.: |
| v. | |
| EXPRESS SCRIPTS, INC., ACCREDO HEALTH GROUP, INC. | |
| Defendant. | |

## COMPLAINT

Plaintiff AIDS Healthcare Foundation ("AHF") brings this federal antitrust and state unfair trade practices action against Defendant Express Scripts, Inc. ("ESI") and its wholly owned subsidiary, Accredo Health Group, Inc. ("Accredo"), and complains and alleges as follows:

## INTRODUCTION

1.    AHF operates a non-profit pharmacy focusing on HIV/AIDS and hepatitis C indications that primarily serves an under-represented population that desperately needs access to specialty drugs in the State of Louisiana (and elsewhere).  This case concerns ESI's use of its monopoly power as a pharmacy

benefits manager ("PBM") in Louisiana to impose anticompetitive restraints to destroy competition among specialty pharmacies in Louisiana. ESI's anticompetitive conduct is explained by the fact that its affiliate, Accredo, is a specialty pharmacy that competes with AHF and others. By reducing or destroying the competition, Accredo can attempt to monopolize the specialty pharmacy market in Louisiana.

2.      ESI is a PBM that controls access to more than 70% of individuals covered by health plans in Louisiana, including those who need, or may need, specialty drugs for treating HIV and hepatitis C (as well as other very expensive specialty drugs not available in most traditional pharmacies). These specialty drugs are typically only available in specialty pharmacies—an industry recognized subset of pharmacies that offer services and medications that primarily treat rare and complex medical conditions. To provide these specialized services to individuals covered by health plans, specialty pharmacies, like AHF, need to work through PBMs like ESI.

3.      ESI has engaged in an anticompetitive scheme to leverage its monopoly power as a PBM to unilaterally impose arbitrary and capricious contract terms and fees on specialty pharmacies like AHF (and by extension their patients). ESI accomplishes this by imposing one-sided terms, obscuring and distorting the information needed to understand ESI's application of contractual formulas and

2

reimbursement rates, and then reimbursing specialty pharmacies at rates so low as to often cause them to lose money on these essential and life-saving drugs. Among the means that ESI employs in furtherance of this scheme is to impose unattainable conditions on rebates that specialty pharmacies simply cannot achieve (as addressed more fully below). Yet, because ESI is the dominant PBM by far in Louisiana (again with access to more than 70% of individuals covered by health plans), specialty pharmacies have no choice but to accept ESI's terms.

4.      The result, which ESI knows full well, is to prevent independent specialty pharmacies from being able to compete, long-term. AHF and other specialty pharmacies in Louisiana have been harmed, while ESI's affiliate, Accredo, benefits.

5.      This is not how a competitive market should operate. Indeed, the FTC, the State of Ohio, and others, including recent investigative reports by the New York Times and the Wall Street Journal (as addressed more fully below), make clear that ESI (and other PBMs) is distorting competition through anticompetitive conduct to the detriment of specialty pharmacies like AHF and their patients.

6.      AHF seeks injunctive relief to restore fair competition so that AHF (and others) can effectively compete and continue to help thousands of patients have choice and access to life-saving specialty drugs.

3

## PARTIES

7.     Plaintiff AIDS Healthcare Foundation is a not-for-profit, public benefit, tax exempt, 501(c)(3) corporation domiciled in and with its principal place of business in Los Angeles, California. AHF is the world's largest provider of health care services to people living with HIV/AIDS and is the largest private-sector provider of HIV/AIDS medical care to people in the United States.  AHF's mission is to provide cutting edge medical care to people living with HIV/AIDS regardless of their ability to pay, and AHF provides medical care and pharmacy services and advocacy to more than 2 million patients in 45 countries, including the United States.  AHF owns and operates the AHF Pharmacy—which is made up of specialty pharmacies that focus on serving patients that are HIV and Hepatitis C positive.  AHF operates 63 retail, accredited, specialty pharmacies in 14 states, Washington D.C. and Puerto Rico, including a pharmacy in Baton Rouge, Louisiana.  AHF's pharmacies are accredited as specialty pharmacies by two respected accrediting entities, URAC and ACHC.  Accredited specialty pharmacies have demonstrated superior proficiency handling specialty medication which require higher levels of monitoring and patient education.  The great majority of AHF's patients and pharmacy customers are people living with HIV/AIDS with varying types of insurance coverage, including patients enrolled in the Medicare Part D prescription program.  AHF provides care for free to people without means

of paying for it, and to people of limited means who rely on government programs such as Medicaid, Medicare, and the Ryan White CARE Act to pay for care.  AHF is an essential safety net provider for disenfranchised, high-risk populations.

8.     AHF is informed and believes, and based thereon, alleges as follows: Express Scripts, Inc. is a Delaware corporation with its principal place of business at 1 Express Way, St. Louis, Missouri.  ESI is registered to do business in Louisiana and does extensive business in Louisiana.  ESI is believed to be a wholly-owned subsidiary of Evernorth Health, Inc., which is a wholly-owned subsidiary of Cigna Group ("Cigna"), an international health services corporation with an adjusted revenue of $195 billion in 2023.[1]  On December 20, 2018, Cigna acquired ESI, then the nation's largest pharmacy benefits manager ("PBM"), for $67 billion.[2]  This took another rival, Cigna's PBM, out of the market.  In 2022, ESI announced that a further agreement with another health care entity pushed the number of lives covered by ESI to more than 100 million Americans.  Over 67,000 retail pharmacies across the United States participate in one or more of ESI's

---

[1]   Cigna Corp., Annual Report (10-K) p. 52, (2023) https://d18rn0p25nwr6d.cloudfront.net/CIK-0001739940/3d4e5959-a432-4d52-885e-1b77451772c8.pdf.
[2]   Cigna Corp., Annual Report (10-K) (Feb. 28, 2019) https://stocklight.com/stocks/us/nyse-ci/cigna/annual-reports/nyse-ci-2019-10K-19644349.pdf.

contracted pharmacy benefit networks.[3]  In 2017, ESI adjudicated over 877 million claims through those pharmacies.  *See* n.3.

9.     AHF is informed and believes, and based thereon, alleges as follows: Accredo Health Group, Inc. is a Delaware corporation with its principal place of business in Memphis, Tennessee.  Based upon publicly available sources, Accredo is identified as a wholly-owned subsidiary of ESI.  In addition to ESI, Cigna is also the ultimate parent company of Accredo.  Accredo is a competitor of AHF and does business in the same states as AHF, including Louisiana.  In 2023, Accredo had estimated revenues of $59.5 billion and a national market share of 24%, the second biggest national market share behind CVS Specialty Pharmacy who had a market share of 30% and revenues of $73.3 billion.  Within the State of Louisiana, Accredo is estimated to have a market share significantly higher than 24% for specialty pharmacy services because its parent entity, ESI, controls access to more than 70% of individuals covered by health plans in Louisiana.

## SUBJECT MATTER JURISDICTION

10.     This action is instituted under Section 16 of the Clayton Act (15 U.S.C. §§ 15, 26) to secure injunctive relief caused by violation of Sections 1 and 2

---

[3]  *See* Committee on Investigations and Government Operations, New York Senate, *Final Investigative Report: Pharmacy Benefit Managers in New York* 29 (May 31, 2019), https://www.nysenate.gov/sites/default/files/article/attachment/final_investigatory_report_pharmacy_benefit_managers_in_new_york.pdf.

of the Sherman Act (15 U.S.C. §§ 1, 2), as alleged herein.  This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337.

11.     This Court also has supplemental jurisdiction over that part of this civil action's subject matter that arises under Louisiana state law, because that part is so related to the claims under federal law as to form part of the same case or controversy under Article II of the U.S. Constitution.  28 U.S.C. § 1367.

### PERSONAL JURISDICTION AND VENUE

12.     This Court has general and specific personal jurisdiction over ESI and Accredo. ESI's principal place of business is in St. Louis, Missouri. ESI and Accredo do extensive business in Missouri.  15 U.S.C. § 22.

13.     Venue is proper in this district under 28 U.S.C. § 1391(b)(1), because defendant ESI resides in this district.

14.     Venue is also proper under 15 U.S.C. § 22, because ESI and Accredo inhabit, may be found, or transacts business here and is a corporation registered to do business in Missouri.

### FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

**A.     The Role of PBMs and Specialty Pharmacies: How Consolidation in the Industry Has Afforded ESI Substantial Monopoly Power**

15.     As more fully explained below, ESI has engaged in an anticompetitive scheme that harms competition among specialty pharmacies in Louisiana.  By

leveraging access to patients, ESI forces specialty pharmacies to accept contractual

terms that are arbitrary and capricious, lack transparency, and do not otherwise

comport with free market principles.  AHF and other independent specialty

pharmacies have little choice but to accept these opaque and one-sided terms

because they have to be able to contract with ESI to service patients in Louisiana—

given that ESI controls access to more than 70% of all covered patients in the State.[4]

ESI's anticompetitive scheme harms unaffiliated, specialty pharmacies and distorts

the competitive process because ESI simultaneously steers covered patients to its

affiliated specialty pharmacy, Accredo.  U.S. Federal Trade Commission, *Pharmacy*

*Benefit Managers: The Powerful Middlemen Inflating Drug Costs and Squeezing*

*Main Street Pharmacies, Interim Staff Report* 21, 30–38 (July 2024) [hereinafter

"FTC Interim Report"] attached hereto as Exhibit A.  As stated by the New York

Times, "[t]he disappearance of local pharmacies limits health care access for poorer

communities but ultimately enriches the P.B.M.s' parent companies, which own

drugstores or mail-order pharmacies."  Rebecca Robbins & Reed Abelson, *The*

*Opaque Industry Secretly Inflating Prices for Prescription Drugs*, N.Y. Times

---

[4]  *See* Matej Mikulic, *Market Share of the Largest Pharmacy Benefit Manager by U.S. State 2022*, Statista (May 31, 2023) [hereinafter "Statista"], https://www.statista.com/statistics/1387515/market-share-of-largest-pbm-in-every-us-state/#:~:text=This%20statistic%20shows%20the%20market%20share%20of%20the,Express%20Scripts%20held%2089%20percent%20of%20the%20market.

(June 21, 2024), https://www.nytimes.com/2024/06/21/business/prescription-drug-costs-pbm.html [hereinafter "N.Y. Times Article"]; *see also* FTC Interim Report at 1 ("Between 2013 and 2022, about ten percent of independent retail pharmacies in rural America closed."); Complaint at ¶¶ 9, 21, State of Ohio, ex rel. Dave Yost Attorney General of Ohio v. Ascent Health Services LLC, et al. (Case No. 23-CV-H-03-0179) (Mar. 27, 2023) [hereinafter "Ohio Compl."] (stating that pharmacies in under-served communities in Ohio are struggling to stay in business and PBMs are pushing customers away from local pharmacies to their affiliated pharmacies). "Closures of local pharmacies affect not only small business owners and their employees, but also their patients.  In some rural and medically underserved areas, local community pharmacies are the main healthcare option for Americans."  FTC Interim Report at 1.

16.    To understand how ESI unlawfully harms competition in the specialty pharmacy market in specific geographic areas, including Louisiana, it is helpful to understand ESI's role as a PBM and how consolidation and vertical integration has placed it in such a powerful position.

17.    The largest PBMs, including ESI, are owned by huge health care conglomerates, including CVS Health, Cigna and United Health Group.  PBMs negotiate on behalf of the health care conglomerates with the drug manufacturers to obtain rebates and discounts on the price of pharmaceutical drugs.

18.     The three biggest PBMs, Caremark, Express Scripts and OptumRx (the "Big 3 PBMs"), have come to dominate the pharmacy space and collectively process roughly 80% of prescriptions in the United States.  *See* N.Y. Times Article, *supra*; FTC Interim Report at 1.

19.     While the original purpose of PBMs was to serve as a counterweight to the largest drug manufacturers and reduce drug costs for patients, in recent years they often do the opposite—resulting in higher prices for patients to pad the PBM's own corporate profits.  As outlined in a recent New York Times article, PBMs may have started out as a means of evening the playing field to negotiate lower drug prices; however, today PBMs "steer patients toward pricier drugs, charge steep markups on what would otherwise be inexpensive medicines and extract billions of dollars in hidden fees."  N.Y. Times Article, *supra*; *accord* FTC Interim Report at 3.

20.     As relevant to this lawsuit, PBMs reimburse pharmacies, including specialty pharmacies like AHF, for the cost of pharmaceutical drugs.  Specialty pharmacies offer services and medications that primarily treat rare and complex medical conditions and provide required special handling, storage, and

administration of these medications.  Only about 3% of total United States

pharmacy locations are accredited as a specialty pharmacy.[5]

21.    As explained above, AHF owns and operates the AHF Pharmacy—

which is made up of specialty pharmacies that focus on serving patients that are

HIV and Hepatitis C positive.  AHF's pharmacies, including its pharmacy in Baton

Rouge, Louisiana, are accredited as specialty pharmacies—with superior

proficiency in handling specialty medication which require higher levels of

monitoring and patient education.  AHF is an essential safety net provider for

disenfranchised, high-risk populations, including in Louisiana.

22.    The specialty pharmacy market has undergone significant

consolidation over the past decade.  The top 3 specialty pharmacies by revenue are

all owned by vertically integrated organizations that also own a PBM—CVS

Specialty Pharmacy, owned by CVS Health (PBM is Caremark); Accredo, owned

by Cigna (PBM is Express Scripts); and Optum, owned by UnitedHealth Group

(PBM is Optum Rx).[6]  *See* Fein, *supra* note 5.

---

[5]  Adam J. Fein, *The Top 15 Specialty Pharmacies of 2023: Market Shares and Revenues at the Biggest PBMs, Health Plans, and Independents*, Drug Channels (April 16, 2024), https://www.drugchannels.net/2024/04/the-top-15-specialty-pharmacies-of-2023.html.
[6]  Adding to the complexity of its vertical integration, in 2019, ESI formed Ascent, a group purchasing organization (GPO), and invited its competitor, Prime Therapeutics LLC, into Ascent's ownership.  The GPO also serves Humana Pharmacy Solutions, one of the top 6 PBMs.  Ascent controls negotiations for 100 million covered lives in the United States.  Ohio Compl. ¶¶ 26–27.  The State of

23.     ESI's affiliated entity, Accredo, is a competitor to AHF and serves patients with chronic health conditions, including HIV/AIDS and Hepatitis C. Accredo also serves patients in Louisiana.  Accredo, like AHF, must be licensed by the State of Louisiana to sell specialty drugs to individuals located in Louisiana.

24.     As alleged herein on information and belief, ESI, as one of the Big 3 PBMs, has used its market power in recent years (achieved through extensive consolidation and the anticompetitive means addressed below) to harm smaller rivals and steer patients to its vertically integrated, affiliated pharmacy.  *See* FTC Interim Report at 21; *see also* Ohio Compl. ¶¶ 9, 21, 146 (stating that PBMs are pushing pharmacies in under-served communities in Ohio to their affiliated pharmacies).

**B.     ESI Restrains Competition in the Market Through Anticompetitive Contracts and Monopoly Leveraging**

25.     ESI uses its contracts as a basis to effectuate its anticompetitive scheme to foreclose competition in the specialty pharmacy market.  ESI leverages access to patients in its insurance networks to acceptance of its unilaterally imposed pricing and fee terms on a take-it-or-leave-it basis.  The ESI contract

---

Ohio alleges in its complaint against ESI and others that Ascent is used to fix rebate prices, bringing claims under Ohio's antitrust statute, the Valentine Act.  *Id*. ¶ 7.  Ohio has alleged that these practices especially hurt independent pharmacies who are being forced out of business by ESI's practices.  *Id*. ¶ 8.

terms are purposefully opaque, complex and conditional—designed to make it virtually impossible for specialty pharmacies to receive the information needed to determine reimbursement rates and thus actual costs of highly specialized drugs needed by individuals suffering from HIV and hepatitis (as well as other conditions).  The result, which ESI knows full well, is to make it almost impossible to meaningfully understand and challenge reimbursements for any given drug. FTC Interim Report at 55.  The lack of information prevents AHF and competitors in the specialty pharmacy market from making informed choices.  In a competitive market, specialty pharmacies would be able to ascertain pricing information and negotiate.  Instead, specialty pharmacies lack meaningful information and are forced to accept low reimbursement rates that would not exist in a competitive market.  Further, these low reimbursement rates paid to AHF and other specialty pharmacies, as well as the fees/clawback payments charged by ESI, drive ESI's excessive margins.  Further, on information and belief, while specialty pharmacies struggle to compete due to ESI's anticompetitive conduct, ESI steers those patients to Accredo which often results in patients paying higher out of pocket costs because ESI is reported to charge supracompetitive prices to health plans for specialty drugs dispensed from its affiliate.  Interim Report at 43–47.[7]

---

[7]  *See* Jared S. Hopkins, *Mail-Order Drugs Were Supposed to Keep Costs Dow. It's Doing the Opposite.*, Wall St. J. (June 25, 2024),

- <u>ESI's Pharmacy Provider Agreement with AHF</u>

26.    In order to access and serve patients in ESI's network, AHF must enter into a network contract with ESI.  AHF entered into a Pharmacy Provider Agreement ("Agreement") with ESI on October 10, 2017.  Since that time, given ESI's market power, including its monopoly over access to the Louisiana PBM covered lives market, the Agreement has literally or essentially been unilaterally amended from time to time by ESI.  The amendments are generally non-negotiable, even for AHF with its 63 pharmacies across the United States and offered on a take-it-or-leave-it basis.

27.    For example, ESI's 2023 contract amendment provided that the reimbursement rate for each drug is initially set by an equation included in the contracts that allow AHF to be reimbursed for the **_lowest_** of the following: (a) the Provider's (AHF's) Usual and Customary Retail Price; (b) the applicable average wholesale price (AWP) discount plus applicable dispensing fee as set forth in the contract; (c) the Provider's submitted ingredient cost plus applicable dispensing fee; (d) an ESI Maximum Allowable Cost (MAC)[8] (if applicable) plus applicable

---

https://www.wsj.com/health/pharma/higher-drug-costs-mail-order-prescription-bf37886f.

[8]   MAC price is determined by an ESI proprietary price list that is created by ESI and considered confidential.  FTC Interim Report at 58.  According to the FTC Interim Report, MAC appears to be the predominant basis for generic reimbursement which accounts for the large majority of prescriptions filled in the United States.  *Id*.  The FTC Interim Report also reports that public comments on

dispensing fee; or (e) state or federal fee schedule (if applicable). *See, e.g.* January 1, 2023, Amendment to the Express Scripts, Inc. Pharmacy Provider Agreement at p. 3 § 3.1; Exhibit A – ES1000 at p.1 § 2.1, dated October 20, 2023.  These terms are essentially what the FTC calls a "black box."[9]  FTC Interim Report at 56, 59. AHF and other specialty pharmacies in the specialty pharmacy market are reimbursed by ESI based on its own unilateral decision to shift price inputs. Adding insult to injury, ESI reimburses these pharmacies without providing any explanation that could be used to support an audit of the payment.

28.    As a result of these and similar equations in other contract amendments, ESI has arbitrarily and capriciously reduced AHF's reimbursement rates every year without proper explanation.  Accordingly, based upon ESI's arbitrary and capricious conduct, coupled with the purposefully opaque means by which ESI hides the reimbursement rates, AHF lacks the basic information needed

---

MAC pricing included that pharmacies are often not allowed to see the MAC list and MAC prices can change as often as daily.  *Id.* at 58–59.  One pharmacy commented: "the language is so confusing you would need a law and accounting degree to understand most of it.  All we can really look for is to compare our cost to what we get paid and hope it is a profit."  *Id.* at 59.

[9]    While the 2024 Amendment appears to have modified these terms, ESI still calculates the reimbursement rate to the lesser of several price inputs that can be changed in ESI's discretion.  *See* 2024 Express Scripts ClearNetwork Amendment to the Express Scripts, Inc. Pharmacy Provider Agreement, effective January 1, 2024, at pp. 2–3 §§ 1.1, 1.8, 2.1.  Further, the contract states that the acquisition cost files used to adjudicate and reimburse AHF will be updated on at least a weekly basis.  *Id.* at § 3.3.

to challenge (or even negotiate) the rates even though AHF is effectively required to deal with ESI by virtue of its monopoly power over the Louisiana PBM covered lives market. *See also* Ohio Compl. ¶16 ("Express Scripts uses its bargaining leverage to force pharmacies, which play a crucial role providing pharmaceutical drugs and care to underserved parts of the State, to accept ever-decreasing reimbursement rates for pharmaceutical drugs.").

29.     As a further example of ESI's use of its monopoly power to impose one-sided reimbursement rates determined by ESI and without any input from AHF (as would be expected in a normal, functioning marketplace), AHF's 2023 contract with ESI provided that:

> more than one AWP discount, and/or Dispense Fee, may be in effect and applied from time to time to claims submitted by Provider under the terms of this [contract]. The Average Discount and Dispense Fee guarantees are not Sponsor-specific rates and fees. Rather, ESI, **in its sole discretion**, may apply different rates and fees, based on the applicable Supplemental Schedule referenced below . . . **ESI shall establish and maintain specific reimbursement rate schedules** . . . **which shall not require Provider's signature**, and shall reflect the applicable AWP discounts and dispense fees applied to the adjudicated prescription drug claims related to a particular Sponsor or group of Sponsors and which Sponsor(s) may or may not be individually listed on a Supplemental Schedule.

January 1, 2023, Amendment to the Express Script's, Inc. Pharmacy Provider Agreement at p. 3 §§ 3.2, 3.3 (emphasis added); *accord* Exhibit A – ES 1000 at pp. 1–2 §§2.2, 2.3; January 1, 2024, Express Scripts ClearNetwork Amendment to the Express Scripts Pharmacy Provider Agreement at pp. 2–3 § §1.11.8, 3.3.

30.     Thus, when ESI decides to arbitrarily and capriciously change terms, ESI uses its market power to force providers like AHF and other specialty pharmacies to accept terms that automatically take effect without the need for consent or signature.  In a competitive market, AHF or others might consider the option of opting out of the ESI network; however, ESI knows full well that is not an option for these specialty pharmacies because of the 100 million lives covered by ESI, including more than 70% of patients in the State of Louisiana.  Statista, *supra* note 4.  The result is that ESI unilaterally imposes terms it knows to be anticompetitive and unsustainable as part of its larger scheme to harm specialty pharmacies and, upon information and belief, ultimately steer covered lives to ESI's affiliated entity, Accredo, so that it can take the business—thereby reducing choice, raising prices, and restricting competition in the specialty pharmacy market.

31.     Indeed, ESI's contract terms are so opaque and determined solely in ESI's discretion, that AHF does not know the amount of its reimbursement until a later true up that occurs after the point of sale.  According to the FTC Interim Report, AHF is not alone in facing these anticompetitive contract terms, and the same or similar conduct has been reported by many pharmacies.  The FTC Interim Report concludes that: "our initial review of documents received thus far reveals that PBMs can have the ability and incentive to put downward pressure on

17

reimbursement rates for rival, unaffiliated pharmacies—including to a degree that may be unsustainable for small, independent pharmacies."  FTC Interim Report at 53.  The FTC Report also highlighted examples of ESI-affiliated pharmacies (like Accredo) receiving significantly higher reimbursement rates than those paid to unaffiliated pharmacies for two case study drugs.  *Id.* at 3, 38–47.  These practices have allowed ESI's and the other Big 3 PBMs affiliated pharmacies to retain "levels of dispensing revenue well above estimated drug acquisition costs, resulting in nearly $1.6 billion of additional revenue on just two cancer drugs in under three years."  *Id*. at 3.  As the FTC Interim Report concluded: "these contracts reflect a vast information asymmetry in which independent pharmacies do not know how much they will be paid under the contract, or when."  *Id*. at 59.

32.     These one-sided contracts restrain and neutralize the competitive process and yield windfall revenues to ESI at the expense of AHF and other unaffiliated specialty pharmacies.[10]

- <u>ESI's Network Performance Contracts, Post Sale Adjustments, and Performance Pools</u>

---

[10]   ESI has been accused of similar conduct in Ohio.  Ohio Compl. ¶ 21 ("These egregiously one-sided contracts restrain and neutralize the competitive process by yielding windfall revenues to Express Scripts at the expense of community pharmacies.").

33.    Prior to the last year or so, ESI made post-sale adjustments many weeks or months after the point of sale.  These adjustments extracted significant clawback payments from AHF and other specialty pharmacies.  *See* FTC Interim Report at 59–60.

34.    Effective January 1, 2024, CMS barred PBMs from retroactively making these adjustments and required that any direct or indirect remuneration be shifted to the point of sale. *Contract Year 2023 Policy and Technical Changes to the Medicare Advantage and Medicare Prescription Drug Benefit Programs*, 87 Fed. Reg. 27704, 27899, 27902 (May 9, 2022) (codified at 42 C.F.R. § 423). However, in an end-run designed to maintain its anticompetitive scheme, ESI did not end its practice of adjusting reimbursement rates through performance fees, it just purportedly moved those adjustments to the point of sale.

35.    In practice, this has meant that AHF can be required to pay into a bonus pool through its Network Performance Agreements.  When triggered, AHF was required to pay up to a $.075 per claim fee (the "Bonus Fee") for all applicable claims.  These Bonus Fees were pooled with fees paid by other retail and specialty pharmacies, including, upon information and belief, Accredo, to fund a "Network Bonus Pool."  The Network Bonus Pool was then used to pay out pharmacies that were supposedly "high performing" under ESI's metrics.  *See* January 1, 2023, Amendment to the Express Script's Inc. Pharmacy Provider Agreement at p. 4

§3.4.  ESI maintained that it could amend the performance protocol at any time **"in its sole discretion"** and without written consent of the Provider.  *Id*. at p. 4 §§ 3.4a, 5 (emphasis added).  ESI also maintained that it is "**the ultimate decision maker** with regard to measurement of Provider's performance during the Evaluation Period and determination of any applicable Performance Awards.  *Id*. at p. 6 (emphasis added).  Upon information and belief, ESI used these contract terms as a pretext to reduce reimbursement payments to AHF and other specialty pharmacies, while increasing reimbursement payments to ESI's own affiliated entity, Accredo.

36.    Performance award payments could not exceed the amounts the specialty pharmacies paid into the bonus pool.  A pharmacy could only recover the full amount paid into the pool if it achieved an average score of four stars or higher across all quality metrics.  *Id*. at p. 6 § 2.2.  If a pharmacy scored below the average score of four stars across all quality metrics, it was only eligible to receive one-fourth of the amount of the bonus fees paid.  *Id.*  Remaining fees in the Bonus Pool were used to make additional payments to the top 20% of pharmacies participating.  *Id*. at p.6 § 2.3.

37.    The "Quality Metrics" used to determine performance are based on CMS guidelines for hospitals—not for pharmacies—and are based on goals outside of the specialty pharmacy's control, such as ratings based on a patient's adherence to certain medications, including, diabetes medication, hypertension medication,

20

and cholesterol medication.  January 1, 2023, Pharmacy Provider Agreement Amendment at p. 6 § 3; October 20, 2023, Pharmacy Provider Agreement Amendment, Exhibit A – ES 1000 at p. 10 § 1.3.

38.     As ESI fully understands, these metrics make no sense for a specialty pharmacy like AHF because it has little control over whether patients are delayed in picking up medication, whether they regularly take medication, or whether they decide not to continue taking their medication due to side effects.  Indeed, when AHF patients are hospitalized and cannot pick up medications from an AHF pharmacy, ESI still applies the metrics in a manner that punishes AHF.  Further, as a specialty pharmacy specializing in AIDS/HIV, metrics tied to medications that are prevalent among the general population but not prevalent among AHF's patient population punishes AHF (and similarly situated specialty pharmacies).  ESI is well aware that these metrics are arbitrary and capricious and make little sense as applied to specialty pharmacies, but ESI applies them anyway in furtherance of its larger scheme to harm specialty pharmacies and allow Accredo to attempt to monopolize the specialty pharmacy market.  FTC Interim Report at 62–63.  As stated by the FTC, these performance measures "may act primarily as financial levers for profit-seeking PBMs, who also own competing pharmacies, and their clients."  *Id.* at 62.  These metrics have been criticized throughout the industry as

"unexplainable," create "needless uncertainty for pharmacies," and as a "charade."
*Id*. at 62–63.

39.     In addition, AHF has never been provided with script level detail for
any performance fee payments but only totals by score without any detail making it
impossible for AHF to audit the payment amounts.

40.     Historically, these clawback and bonus pool fees were extremely
lucrative to ESI and other PMBs. According to the FTC, clawback payments
extracted from U.S. Pharmacies in 2021 amounted to over $10 billion dollars on
Medicare Part D claims alone.  FTC Interim Report at 61.  AHF alone paid $14
million in clawback payments to ESI from 2020–2023 (total for the United States).

41.     Recently, in order to avoid having to report the amount of these bonus
pool fees as required by CMS guidelines, ESI notified pharmacies on June 10,
2024, that it would no longer collect Medicare bonus pool fees for claims after
June 14, 2024.   Instead, ESI agreed to fund a bonus pool for the top 20%
performers based on the same CMS hospital metrics and informed AHF that it
would provide an updated protocol in the coming weeks.  Because ESI intends to
use the same "metrics" that have no reasonable application to a specialty pharmacy
like AHF, this system will undoubtedly continue to be used as a pretext to
discriminate against AHF and other unaffiliated specialty pharmacies and, upon
information and belief, benefit ESI's affiliate, Accredo.  Indeed, the State of Ohio

has asserted that ESI and other PBMs divert these bonus pool fees to their affiliated pharmacies.  Ohio Compl. ¶ 8.

- _ESI Leverages Access to Patients in Insurance Networks to Force Specialty Pharmacies to Accept its Arbitrary, Capricious and Opaque Contract Terms_

42.    In 2023, ESI managed drug benefits for some 100 million Americans, making it necessary for AHF to contract with ESI to access those patients in its network.  As stated in the FTC's Interim Staff Report, "[b]ecause . . . the Big 3 cover approximately 270 million people, pharmacies often have little choice but to contract with the dominant PBMs to serve patients.  This can give these largest PBMs both enormous leverage over unaffiliated, independent pharmacies and the ability and incentive to act in ways that are detrimental to those pharmacies with limited recourse over unfavorable terms offered by the PBM."  FTC Interim Report at 48.

43.    ESI uses its monopoly power in the Louisiana PBM covered lives market to force the above-referenced anticompetitive contracts onto AHF and other specialty pharmacies.  _See also_ Ohio Compl. ¶ 20 ("Many pharmacies have no real choice but to accept Express Scripts' take-it-or-leave-it contracts, driving many to the brink of insolvency or closure.")

44.     ESI has leveraged its monopoly power in the PBM covered lives market to harm specialty pharmacies in Louisiana by forcing acceptance of ESI's unilateral contracts that are arbitrary and capricious, and not transparent or sustainable.  Upon information and belief, ESI has effectuated this anticompetitive scheme to accrue more market share for its affiliated specialty pharmacy, Accredo. As stated by the New York Times, "[t]he disappearance of local pharmacies limits health care access for poorer communities but ultimately enriches the P.B.M.s' parent companies, which own drugstores or mail-order pharmacies."  N.Y. Times Article, *supra*.  This conduct has also been recognized by the FTC and the State of Ohio.  FTC Interim Report at 1, 16, 54 n.258; Ohio Compl. ¶¶ 9, 21 (stating that pharmacies in under-served communities in Ohio are struggling to stay in business and PBMs are pushing customers away from local pharmacies to their affiliated pharmacies).  Upon information and belief, the same is happening in Louisiana.

45.     Upon information and belief, as a result of steering patients to Accredo, patients pay inflated out of pocket costs for specialty medications further lining the pockets of Cigna and its affiliates, including ESI, while Accredo enjoys higher reimbursement rates.  FTC Interim Report at 19–20, 38–47.

### C.    ESI'S Anticompetitive Intent and Monopoly Power

46.    PBM markets operate state-by-state.[11]  This is because most insurers operate locally and are typically licensed in a single state or region.

47.    ESI controls access to more than 70% of covered lives in the State of Louisiana.  *See* Statista, *supra* note 4.  This is also confirmed by data showing that ESI has a 72% market share for retail pharmacy network management services for commercial health plans in Louisiana.[12]  ESI's anticompetitive and opaque contracting practices are used as a vehicle to prevent Louisiana specialty pharmacies from competing; while at the same time ESI diverts patients to its own affiliated specialty pharmacy, Accredo.  As a direct result of ESI's exercise of market power—through the arbitrary and capricious terms unilaterally imposed via its opaque contract terms and amendments—AHF estimates that it has lost substantial revenues and other unaffiliated specialty pharmacies have also been harmed through lost revenue or exiting the market completely.  As a further result of ESI's exercise of market power, patients in Louisiana have been harmed through less choice, paying higher prices, and at least in some instances lack of access to local brick and mortar pharmacies.  *See, e.g.*, FTC Interim Report at 30–47.

---

[11]    José R. Guardado, Am. Med. Ass'n, *Policy Research Perspectives: Competition in Commercial PBM Markets and Vertical Integration of Health Insurers with PBMs* at 4–5 (2023 update), https://www.ama-assn.org/system/files/prp-pbm-shares-hhi.pdf?utm_effort=MRNRD0.

[12]    Guardado, *supra* n. 11, Exhibits A1, A2 and A3 at pp. 21-25.

48.     ESI's ability to unilaterally control contract terms and to change the terms in its sole discretion and at its whim, along with AHF's forced acquiescence of the terms, also evidence ESI's monopoly power.

**D.     Relevant Market**

49.     There are two relevant markets at issue in this case.  The first market is for patients covered by a health plan (whether through a major insurer, a government funded health insurance program, or an employee sponsored plan) whose pharmaceutical drug purchases are managed by a PBM in the State of Louisiana ("Louisiana PBM covered lives market").

50.     Within this market, PBMs compete to manage pharmaceutical programs for health plans.  PBMs serve as middlemen, negotiating terms and conditions, including pricing and rebates, with drug companies.  Among other things, PBMs offer the following services to their health plan clients: drug formulary design, drug manufacturer contracting, pharmacy contracting and network design, drug utilization management, claims processing, as well as other services such as maintaining beneficiary enrollment information and generating periodic drug utilization and spending reports.  Due to extensive consolidation (as referenced herein), many PBMs are now vertically integrated with larger conglomerates that also offer health plans and pharmacy services.

51.     Based upon publicly available information, ESI is by far the largest PBM in Louisiana and represents at least 70% of patients in the Louisiana PBM covered lives market.

52.     There are significant barriers to entry to operate and compete in the Louisiana PBM covered lives market.  Among other things, PBMs must comply with specific licensing requirements to operate within the State of Louisiana.  The PBMs must also continuously monitor and comply with legal and regulatory requirements, invest large amounts of capital to support the infrastructure required to undertake contract negotiations with large drug manufacturers, pharmacy retail chains, and large health plans.  Additionally, competing in this market requires specialized expertise about how the pharmaceutical and healthcare supply chains work, sophisticated systems for tracking, reimbursing, and adjudicating pharmaceutical prescriptions, and specialized knowledge about how to design drug formularies in order to optimize allocation of pharmaceutical spend among the PBMs.

53.     The geographic scope of the Louisiana PBM covered lives market is the State of Louisiana.  To provide the services that PBMs provide to health plans operating in Louisiana, the PBMs must be licensed in the state to operate.  Twenty-

nine states have their own requirements for licensure of a PBM, thus, each

geographic market is limited by the licensure of that state.[13]

54.    The second market at issue in this case is for specialty pharmacy

providers that dispense specialty pharmacy drugs to patients ("specialty pharmacy

market") in Louisiana.  Specialty pharmacies are state-licensed pharmacies that

solely or largely provide medications for people living with serious health

conditions requiring complex therapies.  Specialty pharmacies are recognized

within the industry as providing a separate and distinct set of services as compared

to traditional pharmacies such as CVS or Walgreens.  Specialty pharmacies can be

separately accredited by independent accrediting agencies, including URAC and

ACHC.  Only about 3% of total United States pharmacy locations are accredited as

a specialty pharmacy.  Fein, *supra* note 5.  Specialty pharmacies focus on handling

high-cost drugs that require more extensive interactions with patients to maintain

ongoing treatments (e.g., anti-viral drugs used to treat HIV).  The cost of specialty

drugs are often magnitudes higher than more traditional drugs dispensed by

traditional pharmacies.  Indeed, spending on specialty drugs totaled $301 billion in

2021, accounting for 50% of total drug spending in 2021 and representing a 43%

---

[13]  *State Pharmacy Benefit Manager Legislation*, Nat'l Acad. for State Health Pol'y (Nov. 7, 2023), https://nashp.org/state-tracker/state-pharmacy-benefit-manager-legislation/.

increase since 2016[14].  The specialty pharmacy market in Louisiana includes both mail-order and brick-and-mortar specialty pharmacies.  AHF, ESI's wholly owned subsidiary pharmacy, Accredo, and others participate in this market.

55.     In order to compete in this product market, a specialty pharmacy needs significant capital set up a mail-order network or a brick-and-mortar store, knowledge of the pharmaceutical industry in order to navigate contracting with wholesalers, manufacturers, PBMs, and health plans, teams of licensed pharmacists to dispense the drugs, knowledge of licensing and regulatory requirements, as well as experience in the pharmaceutical industry.  Further, to provide specialty pharmacy services in Louisiana, specialty pharmacies, such as AHF, must be licensed by the State of Louisiana to provide those services.  If a specialty pharmacy is not licensed in the State of Louisiana, it cannot provide pharmacy services to patients in Louisiana.

56.     The geographic scope of the specialty pharmacy market at issue in this case is the State of Louisiana.  The geographic market includes the entire state because specialty pharmacy competitors, like AHF and Accredo, provide specialty drugs to patients located throughout Louisiana.  Accredo accomplishes this

---

[14]   Sonal Parasrampuria & Stephen Murphy, U.S. Dep't of Health & Human Servs., *Trends in Prescription Drug Spending, 2016–2021*, at 1 (2022), https://aspe.hhs.gov/sites/default/files/documents/88c547c976e915 fc31fe2c6903ac0bc9/sdp-trends-prescription-drug-spending.pdf.

distribution through its mail-order service.  While AHF maintains a physical specialty pharmacy in Baton Rouge, it operates health clinics in Baton Rouge and New Orleans, and AHF is able to distribute specialty drugs to patients throughout Louisiana using delivery and other services.   Specialty pharmacies operating in other states are not reasonable substitutes because Louisiana requires a specific license to operate in the state.  From a patient perspective, Louisiana patients are unlikely to travel out-of-state to purchase specialty drugs needed to treat long-term conditions like HIV and hepatitis C.

### FIRST CAUSE OF ACTION—SHERMAN ACT SECTION 2

### (Attempted Monopolization—Against ESI and Accredo)

57.     AHF hereby incorporates by reference the allegations contained in paragraphs 1 through 56, inclusive, as though set forth fully herein.

58.     Section 2 of the Sherman Act prohibits, *inter alia*, attempts to monopolize any part of the trade or commerce among the States.

59.     ESI and its subsidiary, Accredo, have unlawfully attempted to monopolize the specialty pharmacy market in Louisiana.  This scheme has been effectuated by ESI by leveraging its power in the Louisiana PBM covered lives market, in which has more than a 70% share, to force arbitrary and capricious pricing, clawback, and fee terms on AHF and other specialty pharmacies through its Pharmacy Provider Agreements and Network Performance Agreements.  These

pricing, clawback, and fee terms, that can be changed as often as weekly, make it impossible for AHF and other specialty pharmacies to understand the reimbursement rates that they will receive and thereby effectively negotiate and compete in the specialty pharmacy market.

60.    In perpetrating its anticompetitive scheme and exclusionary conduct, ESI and Accredo have acted with the specific intent to artificially distort competition among specialty pharmacies in Louisiana and, upon information and belief, steer those specialty pharmacies' patients to its affiliated specialty pharmacy, Accredo.  ESI further intends to use its power to allow Accredo to attempt to monopolize the specialty pharmacy market in Louisiana through this conduct.

61.    There is a dangerous probability that ESI/Accredo will achieve its goal of allowing Accredo to monopolize the specialty pharmacy market.  While Accredo is one of the largest specialty pharmacies nationally with a 24% market share, upon information and belief its market share in Louisiana is significantly higher due to ESI's position as the dominant PBM in the state.  Upon information and belief, Accredo's market share in Louisiana is significantly higher than 24% and exceeds the threshold required for attempted monopolization.

62.    ESI and Accredo's conduct and unlawful contractual restraints affect a substantial volume of interstate commerce.

31

63.    ESI and Accredo's conduct has had, and unless enjoined, will continue to have the following injuries effects:

    a.    competition in the Specialty Pharmacy Market has been substantially and unreasonably restricted, lessened, foreclosed and eliminated;

    b.    barriers to entry into the Specialty Pharmacy Market have been raised;

    c.    patient choice has been, and will continue to be, significantly limited and constrained to ESI's affiliated, specialty pharmacy, Accredo;

    d.    access to AHF Pharmacy and other specialty pharmacies will be artificially restricted and reduced and these specialty pharmacies will continue to be harmed and/or excluded from the market;

    e.    ESI will continue to restrict specialty pharmacies from access to information that will allow them to compete in the market to the detriment of patients;

    f.    ESI will continue to charge specialty pharmacies and patients prices that are not reflective of those in a competitive market; and

g.  Upon information and belief, Accredo will continue to charge patients higher prices than would otherwise exist in a competitive market.

64.  ESI and Accredo's conduct has caused AHF and other specialty pharmacies to suffer injury to their business by: (a) foreclosing them from information necessary to negotiate and compete in the specialty pharmacy market; and (b) imposing one-sided terms that are not reflective of free market negotiations.  AHF has been and continues to be directly harmed by ESI/Accredo's anticompetitive conduct in a manner that the antitrust laws were intended to prevent.  AHF has suffered and continues to suffer harm and irreparable injury, and such harm and injury will not be abate until an injunction ending ESI/Accredo's anticompetitive conduct issues.

65.  To prevent these ongoing harms, the Court should enjoin the anti-competitive conduct complained of herein.

## SECOND CAUSE OF ACTION—SHERMAN ACT SECTION 2
### (Monopoly Leveraging—Against Defendants ESI and Accredo)

66.  AHF hereby incorporates by reference the allegations contained in paragraphs 1 through 65, inclusive, as though set forth fully herein.

67.    ESI and Accredo's conduct violates Section 2 of the Sherman Act which prohibits, *inter alia*, leveraging monopoly power in one market to disrupt legitimate competition on the merits in a second market.  15 U.S.C. § 2.

68.    ESI has monopoly power in the Louisiana PBM covered lives market because it controls more than 70% of the covered lives in Louisiana.

69.    ESI has leveraged, and continues to leverage, its monopoly power in the Louisiana PBM covered lives market to disrupt legitimate competition in the specialty pharmacy market in Louisiana.  ESI agrees to provide AHF and other specialty pharmacies access to patients in Louisiana but only by forcing them to accept ESI's contracts containing opaque, arbitrary and capricious pricing, clawback, and fee terms which make it impossible to determine the rates of reimbursement and compete effectively in the specialty pharmacy market.

70.    The purpose and effect of ESI's monopoly leveraging scheme is to artificially distort competition in the specialty pharmacy market and, upon information and belief, allow its affiliate, Accredo, to unlawfully gain market share in this market.

71.    As a result of ESI's leveraging of its monopoly power in the Louisiana PBM covered lives market, ESI has been able to unlawfully disrupt legitimate competition that would otherwise exist in the specialty pharmacy market for the benefit of ESI's wholly owned subsidiary, Accredo.

72.    ESI and Accredo's conduct has had, and unless enjoined, will continue to have the following injuries effects:

a.    competition in the Specialty Pharmacy Market has been substantially and unreasonably restricted, lessened, foreclosed and eliminated;

b.    barriers to entry into the Specialty Pharmacy Market have been raised;

c.    patient choice has been, and will continue to be, significantly limited and constrained to ESI's affiliated, specialty pharmacy, Accredo;

d.    access to AHF Pharmacy and other specialty pharmacies will be artificially restricted and reduced and these specialty pharmacies will continue to be harmed and/or excluded from the market;

e.    ESI will continue to restrict specialty pharmacies from access to information that will allow them to compete in the market to the detriment of patients;

f.    ESI will continue to charge specialty pharmacies and patients prices that are not reflective of those in a competitive market; and

g.   Upon information and belief, Accredo will continue to charge patients higher prices than would otherwise exist in a competitive market.

73.   ESI and Accredo's conduct has caused AHF and other specialty pharmacies to suffer injury to their business by: (a) foreclosing them from information necessary to negotiate and compete in the specialty pharmacy market; and (b) imposing one-sided terms that are not reflective of free market negotiations. AHF has been harmed by ESI's anticompetitive conduct in a manner that the antitrust laws were intended to prevent.  AHF has suffered and continues to suffer harm and irreparable injury, and such harm and injury will not abate until an injunction ending ESI's anticompetitive conduct issues.

74.   To prevent these ongoing harms, the Court should enjoin the anticompetitive conduct complained of herein.

## THIRD CAUSE OF ACTION—SHERMAN ACT SECTION 1
## (Agreement to Unreasonably Restrain Trade—Against Defendant ESI)

75.   AHF hereby incorporates by reference the allegations contained in paragraphs 1 through 74, inclusive, as though set forth fully herein.

76.   ESI's conduct violates Section 1 of the Sherman Act, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in

restraint of trade or commerce among the several States, or with foreign nations."

15 U.S.C. § 1.

77.    The relevant market impacted by ESI's unreasonable restraints of

trade is the specialty pharmacy market in Louisiana.

78.    To serve patients with health plans that cover specialty prescription

medications, ESI forces specialty pharmacies to agree to ESI's arbitrary, capricious

and opaque terms contained in its Pharmacy Provider Agreements and

Performance Network Agreements.  These contractual agreements limit and

purposefully obfuscate the information needed by specialty pharmacies to

negotiate with ESI.  The purpose and effect of ESI's one-sided and onerous

contract provisions is to foreclose competition in the specialty pharmacy market in

Louisiana.

79.    The Pharmacy Provider Agreements and Performance Network

Agreements unreasonably restrain competition in the specialty pharmacy market in

Louisiana and serve no legitimate or pro-competitive purpose that could justify

their anticompetitive effects.

80.    ESI's conduct and unlawful contractual restraints affect a substantial

volume of interstate commerce.

81.    ESI"s conduct and unlawful contractual restraints have substantial

anticompetitive effects, including:

a.   competition in the specialty pharmacy market has been substantially and unreasonably restricted, lessened, foreclosed and eliminated;

b.   barriers to entry into the specialty pharmacy market have been raised;

c.   patient choice has been, and will continue to be, significantly limited and constrained by steering patients to ESI's affiliated, specialty pharmacy Accredo;

d.   access to AHF Pharmacy and other specialty pharmacies will be artificially restricted and reduced and these specialty pharmacies will continue to be harmed and/or excluded from the market;

e.   ESI will continue to restrict specialty pharmacies from access to information that will allow them to compete in the market to the detriment of patients;

f.   ESI will continue to charge specialty pharmacies and patients prices that are not reflective of those in a competitive market; and

g.      Upon information and belief, Accredo will continue to charge

patients higher prices than would otherwise exist in a

competitive market.

82.     ESI's conduct and contractual restraints have caused AHF and other

specialty pharmacies to suffer injury to their business by: (a) foreclosing them

from information necessary to negotiate and compete in the specialty pharmacy

market; and (b) imposing one-sided terms that are not reflective of free market

negotiations.  AHF has been and continues to be directly harmed by ESI's

anticompetitive conduct in a manner that the antitrust laws were intended to

prevent.  AHF has suffered and continues to suffer harm and irreparable injury, and

such harm and injury will not be abate until an injunction ending ESI's

anticompetitive conduct issues.

83.     To prevent these ongoing harms, the Court should enjoin the

anticompetitive conduct complained of herein.

## FOURTH CAUSE OF ACTION—LOUISIANA R.S. 51:1401

### (Unfair Trade Practices—Against Defendant ESI)

84.     AHF hereby incorporates by reference the allegations contained in

paragraphs 1 through 83, inclusive, as though set forth fully herein.

85.     ESI's conduct, described above, violates Louisiana's Unfair Trade

Practices and Consumer Protection Law ("LUTPA"), R.S. 51:1401, *et seq*., which

prohibits any unfair or deceptive trade practice.  ESI's attempted monopolization, monopoly leveraging and anticompetitive contract terms constitute unfair conduct that is unethical, oppressive, and unscrupulous.

86.    Further, ESI's conduct offends established public policy in the State of Louisiana as provided in R.S. 22:1860.3(A) ("pharmacy reimbursements statute") which prohibits ESI from reimbursing a pharmacy in Louisiana less than it reimburses its affiliated pharmacy for providing the same services.  Louisiana's pharmacy reimbursement statute further provides that a violation "shall be considered an unfair method of competition and unfair practice or act" enforceable by private action as provided by LUTPA.  *See* R.S. 22:1860.3(C).

87.    Upon information and belief, based upon information set forth in the FTC Interim Report and elsewhere, ESI reimburses its affiliated specialty pharmacy, Accredo, at rates higher than that provided to AHF for the same services.

88.    AHF has standing to bring this claim because it operates a pharmacy located in Baton Rouge, Louisiana and has suffered injury and lost money as described herein a result of ESI's unfair trade practices and unethical, oppressive, and unscrupulous conduct.

89.     To prevent ESI's ongoing unfair trade practices, the Court should enjoin the anticompetitive conduct complained of herein as permitted by Louisiana law.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiff, AHF respectfully requests that the Court enter judgment in favor of AHF and against defendants ESI and Accredo:

1.     Issuing an injunction prohibiting ESI and Accredo's anticompetitive conduct and mandating that ESI and Accredo take all necessary steps to cease unlawful conduct and to restore competition;

2.     Awarding any and all equitable relief necessary to prevent and remedy ESI and Accredo's anticompetitive conduct;

3.     Awarding reasonable attorneys' fees and costs of litigation;

4.     Granting such other and further relief as the Court deems just and proper.

Dated: July 26, 2024          Respectfully Submitted,


By:  /s/Brian E. McGovern
MCCARTHY, LEONARD & KAEMMERER
Brian E. McGovern, SBN 34677 (MO)
*bmcgovern@mlklaw.com*
Andrew M. Lammert, SBN 60206 (MO)
*alammert@mlklaw.com*
825 Maryville Centre Drive, Suite 300
Town and Country, MO  63017-5946
Telephone:  314-392-5200


KESSELMAN BRANTLY STOCKINGER LLP
David W. Kesselman,
*dkesselman@kbslaw.com*
*Pro Hac Vice* application to be filed
Amy T. Brantly
*abrantly@kbslaw.com*
*Pro Hac Vice* application to be filed
Abiel Garcia
*agarcia@kbslaw.com*
*Pro Hac Vice* application to be filed
Wesley A. Sweger
*wsweger@kbslaw.com*
*Pro Hac Vice* application to be filed
1230 Rosecrans Avenue, Suite 400
Manhattan Beach, CA 90266
Telephone:  310-307-4555

*Attorneys for Plaintiff*
AIDS HEALTHCARE FOUNDATION